1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JULIA POWELL KELLER-MCINTYRE,

        Plaintiff,

  v.

SAN FRANCISCO STATE UNIVERSITY,

        Defendant

_____/

No. C-06-3209 MMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; VACATING HEARING**

(Docket No. 141)

     Before the Court is defendant's motion for summary judgment, filed December 29, 2006.  Plaintiff has filed opposition to the motion, and, with permission of the Court, a supplemental opposition.  Defendant has filed a reply, as well as various objections to evidence.  Having considered the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for resolution without oral argument, see Civil L.R. 7-1(b), hereby VACATES the March 2, 2007 hearing, and rules as follows.

**BACKGROUND[1]**

     Plaintiff Julia Keller-McIntyre was diagnosed with mild schizophrenia in the late 1970s, and has been in treatment and on medication for that condition for "most of the time" since her diagnosis.  (See Plaintiff's Appendix in Opposition to Defendant's Motion for

---

[1] The following background section sets forth the evidence in the light most favorable to plaintiff.  The source of the evidence has, in each instance, been identified; to the extent the Court has relied on evidence attributed to defendant, plaintiff has cited no evidence to the contrary.  Although defendant disputes much of the evidence submitted by plaintiff, such disputes, with limited exception, are not noted herein.

Summary Judgment ("Pl.'s App.") Ex. 38 (Keller-McIntyre Decl.) at 1.)  After her diagnosis, plaintiff obtained a masters degree in public administration, with a concentration in management, from San Francisco State University ("SFSU") in 1984.  (See id. at 1-2.)  Plaintiff began working for SFSU in 1996.  (See id. at 2.)  She initially worked as an Administrative Office Coordinator ("AOC") for the Consumer Family Studies/Dietetics Department ("CFSD") in the College of Health and Human Services ("CHSS").  (See id.)  In that position, plaintiff attests, she "performed many administrative and management duties," including supervising Michael Jensen, a half-time Instructional Support Assistant, for seven years.  (See id.)

In 1998, Dr. Nancy Rabolt ("Dr. Rabolt") became plaintiff's supervisor.  (See id. at 3; see also Defendant's Exhibits in Support of Motion for Summary Judgment ("Def.'s MSJ Ex.") Ex. H (Rabolt Decl.) ¶ 3.)  That year, plaintiff was awarded a "performance-based salary increase"; in 1999, plaintiff was awarded a performance bonus "in recognition of outstanding performance and contributions made during the 1998-99 fiscal year." (See Keller-McIntyre Decl. at 3; see also Pl.'s App. Exs. 7 and 9.)  In 1999, plaintiff was "given the additional duty of fiscal management for the Vista Room," (see Keller-McIntyre Decl. at 3), a faculty-managed restaurant on campus where students "obtain practical experiences alongside their food services management courses," (see Rabolt Decl. ¶ 2).  In 2000, plaintiff received a "merit salary increase . . . based on an overall performance evaluation rating that is above satisfactory"; in 2001, plaintiff received an "in-range salary increase" awarded "[i]n recognition of [plaintiff's] acquired skills, individual merit and competency, and consistent contributions[.]"  (See Keller-McIntyre Decl. at 2 and attachment at 000134, 000127.)

Thereafter, plaintiff attests, she "fell out of favor with Dr. Rabolt" and received two years of average evaluations.[2]  (See id. at 3.)  Dr. Rabolt attests that plaintiff's "work and

---

[2] In her declaration, plaintiff states Dean Zingale told her he thought the average evaluations were because of a personality conflict and not because of work performance. (See Keller-McIntyre Decl. at 3.)  Defendant's objection to this statement as inadmissible hearsay is sustained.

relationships with faculty and staff began to deteriorate" in the 2001 academic year and, although plaintiff "accomplished tasks satisfactorily, she did not exhibit as much cooperation with faculty and staff as the department expected of her." (See Rabolt Decl. ¶ 4.)  In July 2002, according to Dr. Rabolt, a member of the faculty complained that plaintiff was not appropriately supporting staff at the Vista Room, and a new lecturer complained that plaintiff was unhelpful in providing new faculty with orientation materials. (See id. ¶ 5.)  Dr. Rabolt further attests that, in October 2002, she received a complaint from the University's Parking and Transportation Department about plaintiff's demeanor and, in February 2003, plaintiff was involved in "an angry confrontation with one of the faculty who needed to make changes to the Department's class schedule." (See id. ¶ 5.)

In the spring of 2003, the Chair Review Committee circulated by email, to all faculty and staff at CFSD, a report concerning Dr. Rabolt's performance as chairperson of the CFSD.  (See Rabolt Decl. ¶ 6.)  The report contained remarks by a member of the faculty, who opined that Dr. Rabolt had "very weak" and "dysfunctional office staff."  (See id.; see also Keller-McIntyre Decl. at 3; Pl.'s App. Ex. 11.)  Plaintiff attests she was "shocked and outraged" and, thereafter, was diagnosed with Post Traumatic Stress Disorder.  (See Keller-McIntyre Decl. at 3-4.)  Plaintiff initiated a grievance against the University for libel; the University complied with plaintiff's request that the statement be removed from the review document and that she receive an apology, and, additionally, awarded plaintiff a 10% raise.  (See Rabolt Decl. ¶ 6; Keller-McIntyre Decl. at 4; Def.'s MSJ Ex. V (Taylor Decl.) ¶ 4); Def.'s MSJ Ex. W (Settlement Agreement) ¶ 1.)

On April 7, 2003, plaintiff submitted a "Reasonable Accommodation Request Form" to the Disability Programs and Resource Center ("DPRC") at SFSU, pursuant to which plaintiff sought a modified work schedule[3] and a partition around her desk.  (See Def.'s MSJ Ex. R (Chelberg Decl.) ¶ 4 and Ex. S; Keller-McIntyre Decl. at 4.)  On April 9, 2003, the DPRC received a letter from C. Martel Bryant, M.D. ("Dr. Bryant"), stating that he

---

[3] Plaintiff submits no further evidence as to the nature of this requested modification or the reason therefor.

1  supported plaintiff's "reasonable accommodation request for a partition around her desk as

2  one effort to protect her functions and respect."  (See Chelberg Decl. ¶ 5 and Def.'s MSJ

3  Ex. T at 1.)  The DPRC asked Dr. Bryant to provide his diagnosis of plaintiff's disability and

4  his suggestions with respect to how plaintiff's work environment should be restructured in

5  view of plaintiff's disability.  (See Chelberg Decl. ¶ 5.)  On June 11, 2003, Dr. Bryant

6  submitted a letter stating that plaintiff suffered from "Posttraumatic Stress Disorder

7  Chronic," with "symptoms of disorganization, anxiety and depression when experiencing

8  work-related stress," and opined that "[a]n office space or a divider in her working space

9  would be helpful."  (See Chelberg Decl. ¶ 5 and Def.'s MSJ Ex. T at 2.)  The DPRC also

10 received a note from James Gabby, M.D. ("Dr. Gabby"), stating that he had diagnosed

11 plaintiff with "Schizophrenia, Residual Type 295.60," and opining that plaintiff could perform

12 her work successfully if she were provided the work environment she had requested.  (See

13 Chelberg Decl. ¶ 5.)  Although plaintiff testified at her deposition that "three or four faculty,"

14 including Dr. Rabolt, "opposed the screen," (see Pl.'s App. Ex. 37 at 122:1-11), the DRPC

15 ultimately approved plaintiff's request for a partition around her desk, (see Chelberg Decl.

16 ¶ 5.)[4]

17

18 [4] Plaintiff has submitted various statements to the effect that the partition, after it was installed, was unfavorably received by her supervisors and co-workers; defendants'

19 objections to such statements will be sustained as follows:
       a.  Plaintiff attests that "[s]ome faculty in faculty meetings attacked the screen and

20 Dr. Rabolt mocked [her] use of the partition and led [an] attack to remove it[.]"  (See Keller-McIntyre Decl. at 4.)  Defendant's objection to the above-referenced statement as

21 conclusory and without foundation is sustained; plaintiff has not set forth sufficient detail to permit a trier of fact to determine what was said or done and whether plaintiff has personal

22 knowledge thereof.  See, e.g., Forsberg v. Pacific Northwest Bell Telephone Co., 840 F.2d 1409, 1419 (9th Cir. 1988) (holding "purely conclusory allegations of discrimination, with no

23 concrete, relevant particulars, will not bar summary judgment"); Walker v. Hoffman, 583 F.2d 1073, 1075 (9th Cir. 1978) (holding plaintiff's declaration that he was "harassed"

24 amounts to "nothing more than an unsupported conclusory allegation insufficient to raise a 'genuine issue'" on motion for summary judgment).

25     b.  Plaintiff submits an email from Vicki Anderson, dated April 4, 2003, stating that plaintiff's "screen is . . . being attacked as 'unfriendly,' thanks to the dept. chair making

26 absolutely NO effort to explain why it is there in the first place."  (See Pl.'s App. Ex. 13.) Defendant's objection to this exhibit as inadmissible hearsay is sustained.

27     c.  Plaintiff attests in her declaration that "Dean Zingale did not like the screen either."  (See Keller-McIntyre Decl. at 4.)  Defendant's objection to such statement as

28 conclusory and without foundation is sustained.
       d.  Plaintiff testified at her deposition that a student assistant told her that he or she

1    On May 16, 2003, Dr. Rabolt requested input from faculty and staff at CFSD about

2  plaintiff's work performance, for purposes of preparing plaintiff's performance evaluation.

3  (See Rabolt Decl. ¶ 7.)  In response, Dr. Rabolt attests, she received "a number of positive

4  comments about plaintiff's work" as well as "a significantly greater number of comments

5  that were very critical of plaintiff," (see id. ¶ 7); based on that feedback, and on her own

6  observation of plaintiff's work, she "gave plaintiff an average overall performance

7  evaluation," (see id.).

8    In June 2003, Dean Don Zingale ("Dean Zingale") reassigned plaintiff to the position

9  of Administrative Office Coordinator of Kinesiology, and reassigned Toan Thai ("Thai"), the

10  existing Administrative Office Coordinator of Kinesiology to plaintiff's position in the CFSD.

11  (See Taylor Decl. ¶ 5 and Def.'s MSJ Ex. X.)  Plaintiff attests the assignment was made

12  against her will.  (See Keller-McIntyre Decl. at 4.)  The current CHHS Dean, Don Taylor

13  ("Dean Taylor"), attests that he participated in all meetings with Dean Zingale about

14  plaintiff's reassignment; the reason for the transfer, according to Dean Taylor, was that the

15  Department of Kinesiology was welcoming a new chairman to the department, Bob Spina

16  ("Dr. Spina"), who was new to the university, and Dean Taylor and Dean Zingale felt Spina

17  "would benefit from having an Administrative Office Coordinator of plaintiff's experience

18  who was familiar with the complexities of the department."  (See Taylor Decl. ¶ 5.)

19    On July 14, 2003, plaintiff submitted a second request for a modified work schedule;

20  she requested therein that she be permitted to work from 7:00 a.m. to 4:45 p.m., Monday

21  through Thursday, and from 7:15 a.m. to 12:00 p.m. on Fridays.  (See Chelberg Decl. ¶ 6

22  and Def.'s MSJ Ex. U.)  Plaintiff attests Dr. Spina "gave [her] so much trouble about [her]

23  accommodation that [she] dropped it because [she] was afraid of his adverse evaluation

24  and [she] worked the schedule that he insisted."  (See Keller-McIntyre Decl. at 5.)  Plaintiff

25  further attests that Dr. Spina "did modify [her] schedule somewhat but he did not give [her]

26

_____

27  had overheard Dean Zingale say he did not like the screen around plaintiff's desk.  (See
    Pl.'s App. Ex. 37 at 124:18-125:13.).  Defendant's objection to such statement as
28  inadmissible hearsay is sustained.

1  the Friday afternoons [she] needed off for appointments with [her] psychiatrists[.]" (See id.)[5]

2  Plaintiff testified at her deposition that although she did not tell Dr. Spina that her requested

3  modified work schedule "was necessary because of a psychiatric disability," she made it

4  clear to him that she was requesting the schedule modification as "a disability

5  accommodation."  (See Pl.'s App. Ex. 37 at 186:6-187:1.)

6      Immediately after her reassignment, plaintiff attests, Dr. Spina "removed [her]

7  supervisory responsibilities."  (See Keller-McIntyre Decl. at 4.)  Plaintiff further attests that

8  Dr. Spina hired Maria Allain ("Allain"), "would not let [plaintiff] have any role in the selection

9  process, although [Allain] was to be the Administrative Support Coordinator reporting to

10  [plaintiff] as the 'office manager,'" and "required Maria Allain to report directly to him."  (See

11  id. at 4-5.)  According to plaintiff, Dr. Spina "worked closely with Maria Allain and undercut

12  [plaintiff]," accused plaintiff of making mistakes she did not make, and "made a big deal of

13  problems [she] had" with respect to "securing a chemical one time and of ordering Dell

14  computer on another occasion."  (See id. at 5.)

15      Plaintiff further attests that Dr. Spina "gave [her] a negative performance appraisal

16  even though [she] accomplished the work in an excellent and timely fashion."  (See id.;

17  Def.'s Ex. N (6/28/04 performance evaluation).)[6]  In that performance evaluation, Dr. Spina

18  rated plaintiff's performance on the skill of "leading others" at 1 on a scale of 1 to 5.  (See

19  id.)[7]

20  _____

21      [5] Defendant has submitted evidence that although Dr. Spina initially expressed
    concerns that no one was available to cover plaintiff's responsibilities in her absence,

22  plaintiff's requested modified work schedule was approved by the DPRC and plaintiff was
    afforded the modified work schedule she requested. (See Chelberg Decl. ¶ 6; Def.'s MSJ

23  Ex. K (Spina Decl.) ¶ 7.)

24      [6] Dr. Spina attests that plaintiff "had little knowledge of the University's policies and
    procedures," "had difficulty with student payroll matters, ordering equipment, and

25  purchasing and reimbursement," "did not demonstrate much initiative," and made "a large
    number of mistakes . . . on simple tasks."  (See Spina Decl. ¶ 8.)

26      [7] Plaintiff's expert, Gerald V. Barrett ("Dr. Barrett"), attests that plaintiff's job
    description provides, in Dr. Barrett's words, that plaintiff has "no responsibility for leading

27  others," (see Pl.'s Supp. Opp. Ex. 41 at 9 and Ex. P), and, consequently, "should not have
    been rated on her June 2004 performance evaluation for 'leading others,'" (see id. at 10.)

28  Dr. Barrett relies on a university-wide job description for the position of "Administrative

6

1    Plaintiff attests that Dr. Spina requested she be reassigned, and that she also

2   wanted to be reassigned, to another position.  (See id. at 6; see also Taylor Decl. ¶ 6.)

3   Dean Taylor attests that he met with plaintiff in the summer of 2004 to discuss her

4   interests, in order to determine where she could be reassigned.  (See Taylor Decl. ¶ 7.)

5   Dean Taylor further attests that, on September 13, 2004, he "temporarily reassigned

6   plaintiff to the [CHHS] Office as an Administrative Analyst, Specialist, under Ryziard

7   Dziadur ["Dziadur"], the Director of Operations/Controller," because Dziadur needed short-

8   term assistance.  (See Taylor Decl. ¶ 7.)  Plaintiff attests she "was given the duty of

9   coordination and note taking for the Gerontology Task Force Committee and this was [her]

10   only real duty besides that of scholarships."  (See Keller-McIntyre Decl. at 6.)  Plaintiff

11   attests she had "virtually nothing to do."  (See id.)  Plaintiff further attests Dean Taylor and

12   Dziadur "opposed [her] accommodation work schedule, but Gene Chelberg, Disability

13   Director supported it."  (See id.)

14    In the Fall of 2004, Jason Katz ("Katz") was hired to manage SFSU's Student

15   Resource Center ("SRC").  (See Taylor Decl. ¶ 8.)  Dean Taylor attests that Katz requested

16   a full time coordinator to serve as a receptionist and to help with the paperwork around the

17   office.  (See id.)  Dean Taylor further attests he felt it would be an appropriate assignment

18   for plaintiff because she had "expressed an interest in assessment work," and, on January

19   1, 2005, reassigned plaintiff to work as an Administrative Office Coordinator in the SRC

20   under Katz.  (See id.)  According to Katz, plaintiff's position in the SRC "is a non-

21   management position that supports the administrative functions of the [SRC] . . . and is not

22   a counseling position."  (See Def.'s MSJ Ex. DD (Katz Decl.) ¶ 3.)[8]

23   ───────────────────────────

24   Analyst/Specialist," however, and not on the job description prepared by Dr. Spina
     specifically to describe plaintiff's duties; the job description prepared by Dr. Spina expressly
25   provides that plaintiff had the duty to "[s]upervise student assistants in conjunction with the
     Academic Support Coordinator."  (See Spina Decl. ¶ 5 and Ex. L.)

26    [8] Plaintiff attests that in her new position at the SRC, "[t]here were no real duties for
27   [her] to perform" and that, although Katz included various duties in her job description, "he
     excluded [her] from their performance."  (See Keller-McIntyre Decl. at 7.)  Defendant's
28   objection to this evidence as without foundation is sustained.  The statements are too
     conclusory and the only facts submitted by plaintiff in support thereof is that one particular

1        Shortly after plaintiff was reassigned to the SRC, plaintiff complained to Dean Taylor

2   "about working for a younger man with little management experience." (See Taylor Decl.

3   ¶ 9.)[9] Katz is 35 years old and has a graduate degree in counseling, (see Def's MSJ Ex. E

4   (Katz Dep.) at 6:9-24); he does not have a degree in management, (see Pl.'s App. Ex. 23

5   (Katz Dep.) at 15:14-17), and had no prior experience supervising staff at SFSU with the

6   exception of supervising "student assistants and counseling interns," (see Def.'s MSJ Ex. E

7   (Katz Dep.) at 8:9-24).  Dean Taylor attests that Katz was hired as the Coordinator of the

8   SRC "because he had a master's degree in counseling, with a specialization in school

9   counseling, and because he had already worked at the University as an academic

10  counselor"; according to Dean Taylor, Katz's "background, education and training matched

11  the particular needs of a coordinator of the [SRC]." (See Taylor Decl. ¶ 9.)  As Coordinator,

12  Katz "manage[s] the operations of the [SRC] and perform[s] and supervise[s] all career

13  counseling, personal counseling and student assessment" for the SRC.  (See Def.'s MSJ

14  Ex. DD (Katz Decl.) ¶ 1.)

15       Dean Taylor further attests that the SRC was experiencing increased foot traffic and

16  that he felt it was important for the SRC to be available to students at all times during the

17  work week.  (See Taylor Decl. ¶ 10.)  Consequently, Dean Taylor attests, he "raised the

18  issue of plaintiff not working a full day on Fridays," but after consultation with the DPRC,

19  permitted plaintiff "to keep her modified work schedule, and to take Friday afternoons off."

20  (See id. ¶ 10.)

21       In February 2005, plaintiff asked Katz and Dean Taylor if "she might be able to

22  interpret assessment reports generated by the Myers Brigg Type Indicator" ("MBTI").  (See

23  Taylor Decl. ¶ 11; Katz Decl. ¶ 4.)  Dean Taylor attests he told plaintiff "she was not

24  _____

25  set of files was already being handled by student assistants at the time of her arrival and
    continued to be handled by them.  (See Keller-McIntyre Decl. at 7.)  Additionally, Katz

26  attests plaintiff had "significant responsibilities" and itemizes numerous specific duties for
    which plaintiff was responsible.  (See Katz Decl. ¶ 5.)

27      [9] Although the Court has not located plaintiff's precise age in the record, she stated

28  in responses to interrogatories that she is "20 years" older than Katz.  (See Def.'s MSJ Ex.
    C at 11:8-9.)

qualified to interpret MBTI reports" because "[t]he MBTI is a psychological instrument tool that requires a degree or advanced study in counseling psychology," which plaintiff lacks. (See Taylor Decl. ¶ 11.)  Katz attests he suggested to plaintiff that she "consider taking a counseling course at the University to familiarize herself with various assessment tools so that she may be more able to administratively assist [him] with [his] counseling responsibilities," but further informed her that "career counseling and similar assessment duties" were his areas of responsibility and were not part of plaintiff's job.  (See Katz Decl. ¶ 4.)

Plaintiff submits evidence that she thereafter completed and received an A- in a counseling course titled Assessment in Counseling, which was described in the SFSU course catalog as involving the "[c]linical process of testing" including the "ability to clinically analyze and interpret assessment instruments, including diagnostic tests for various counseling specializations."  (See Keller-McIntyre Decl. at 9; Pl.'s Supp. Opp. Ex. 41 (Barrett Decl.) at 27 and Ex. H at 2 and Ex. I.)  According to plaintiff's expert, Dr. Barrett, plaintiff's completion of that course qualified her to administer and interpret the MBTI.  (See Pl.'s Supp. Opp. Ex. 41 at 28 and Ex. J (providing "[q]ualification" to use MBTI "is granted to those who . . . have a minimum of a bachelor's degree" and "successful completion of a course in the interpretation of psychological assessments and measurement at an accredited college or university").  Nonetheless, plaintiff attests, Dean Taylor and Katz "inaccurately maintained that [she] had to have a degree in Counseling to do any work in the area[.]" (See Keller-McIntyre Decl. at 9.)

On July 6, 2005, Katz gave plaintiff an "average overall performance evaluation." (See Katz Decl. ¶ 10 and Def.'s MSJ Ex. FF.)  In particular, Katz stated therein that plaintiff "is very professional and organized on her job," "assists her supervisor when he requires it and is willing to help him in his duties," "has made a special point of communicating with her supervisor . . . to find out what he wants her to do and then to do it in the way he wants," and "acts in a professional, courteous and civil way promoting satisfactory interactions with coworkers, students and her supervisor."  (See Def.'s MSJ Ex. FF at 1-2.)

Katz also stated therein, however, that plaintiff "has yet to demonstrate proficient practical knowledge of MS [Microsoft] Office Applications," "has yet to perform at a level one would expect given her years of experience at SFSU and level of education," and "has yet to demonstrate her knowledge of University/College/SRC policies and procedures," (See id. at 1-2.)  Katz further stated therein that "[a]reas where [plaintiff] does not meet expectations and must continue to improve upon include her knowledge and practical skills in areas related to the administrative functions of the SRC including: the proficient use of MS Office Suite applications including Outlook; the practical application of SRC policies and procedures and their effect on both faculty, staff, and students; and demonstrating independence and initiative in regard to the day to day functioning of the office."  (See id. at 3.)[10]

On October 4, 2005, Katz distributed an email to SRC staff, advising them that studying was inappropriate during work hours.  (See Katz Decl. ¶ 11 and Def.'s MSJ Ex. GG.)  Two days later, Katz attests, he noticed plaintiff studying in her cubicle and reminded her that she was not to study during work hours.  (See Katz Decl. ¶ 11.)  According to Katz, plaintiff "responded by arguing that she could properly study during work hours because (a) she was taking a course in assessment which she asserted was 30% of her job duties, (b) she should not be doing student assistant work, and (c) her last performance evaluation was unfair."  (See id.)  Katz attests that he suggested that he and plaintiff meet to review the functions of her job and "expressed [his] concern over her hostility towards [him] since receiving her performance evaluation."  (See id.)

On October 11, 2005, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging SFSU had discriminated against her on the basis of her sex, age, and disability because (1) Dean Taylor denied her request to perform

---

[10] Katz further attests that plaintiff "has not performed [her responsibilities] on a regular basis" and "has refused to perform tasks" that did not consist of "higher administrative management duties and counseling work."  (See Katz Decl. ¶ 6.)  Plaintiff attests that she has "never refused to do any work," although she concedes that she "did try to delegate some work."  (See Keller-McIntyre Decl. at 7-8.)

MBTI assessments, (2) Katz gave her a "lower performance evaluation," (3) she was "given lesser job assignments and excluded from meetings" and was "excluded from training student assistants," and (4) Katz "harassed" her by telling her she could not study during work hours.  (See Keller-McIntyre Decl. at 8 and Pl.'s App. Ex. 40; see also Pl.'s Supp. Brief Ex. 42 (Keller-McIntyre Supp. Decl.) ¶ 1.)

According to plaintiff, "the very next day" after she filed her EEOC complaint, "Dean Taylor called [her] into his office and berated [her] for an hour," called her a "paranoid schizophrenic," and told her that her "work was substandard, and that [she] was incapable of higher administrative and management work."  (See Keller-McIntyre Decl. at 8; Keller-McIntyre Supp. Decl. ¶ 2.)  Plaintiff further attests that Dean Taylor told her that the "idea of [her] doing such administrative and management work was 'ludicrous,' and that if [she] 'didn't know what the word meant, to look it up in the dictionary.'" (See Keller-McIntyre Decl. at 8.)

Katz attests that on the following date, October 13, 2005, he sent Dean Taylor an email "requesting a change in plaintiff's job description as well as a relocation of her work station" because plaintiff "was acting insubordinate and hostile and put little effort at greeting students."  (See Katz Decl. ¶ 12 and Def.'s MSJ Ex. HH.)  According to Katz, recent "exit surveys of students who visited the Student Resource Center showed that only 60% of them believed they had been greeted promptly, a figure that was down from 91% in all previous years."  (See Katz Decl. ¶ 12.)  Thereafter, Katz attests, he met with Dean Taylor to discuss his concerns about plaintiff, and Dean Taylor authorized Katz to revise plaintiff's job description and to move her work station into a different part of the office. (See Katz Decl. ¶ 13.)  Katz further attests that, in plaintiff's revised job description, he "removed plaintiff's responsibility to supervise, hire and train student assistants, and her responsibility to liaise with student associations."  (See id.)

Subsequently, in an internal memorandum to plaintiff dated October 18, 2005, Dean Taylor stated that he had "asked Jason Katz to immediately change the location of [plaintiff's] workstation and to make appropriate changes to the Essential Job Functions of

1   [her] job description" because plaintiff had "demonstrated insubordinate and hostile

2   behaviors when given time sensitive tasks" and because a recent survey had shown a 30%

3   drop in the number of students who felt they were greeted promptly when they visited the

4   SRC.  (See Keller-McIntyre Decl. at 8; Pl.'s App. Ex. 31.)

5           On January 1, 2006, plaintiff's workstation was moved into a conference room in the

6   SRC.  (See Katz Decl. ¶ 14.)  Plaintiff testified at her deposition that having her own office

7   "gave [her] privacy" and "just worked perfectly in terms of [her] mental health."  (See Def.'s

8   MSJ Ex. D (Keller-McIntyre Dep.) at 136:2-14.)  Plaintiff further testified, however, that

9   although she "love[s]" her office, the wall of the office has a "graphic" that "looks like a lamb

10  chipped into the wall biting a butterfly's wing."  (See id. at 225:7-25; Keller-McIntyre Decl. at

11  10-11.)  Plaintiff attests that "[t]his representation made [her] very upset and traumatized by

12  its symbolic meaning[.]" (See id. at 11.)  Katz attests that, on August 1, 2006, he asked the

13  University to paint over the "graphic," which he describes as "chipped paint."  (See Katz

14  Decl. ¶ 14.)

15          Over the past three years, plaintiff has applied for several other positions at the

16  University.  (See Def.'s MSJ Ex. PP(Czaja Decl.) ¶ 4.)  James Czaja, Director of Employee

17  Relations for the Human Resources Department at SFSU, attests that plaintiff was not

18  hired for any of those positions because "[s]he either did not meet the minimum

19  qualifications for those positions, or because other more qualified individuals were hired to

20  fill those positions."  (See id.)

21          On December 11, 2006, plaintiff attests, she was placed on administrative leave

22  because she was "deemed 'incapable of working.'"  (See Keller-McIntyre Decl. at 10.)

23  Plaintiff attests she was told not to report to work on Monday, December 11, 2006, and that

24  she "did not report to work and [is] now at home."  (See id.)  Plaintiff further attests that

25  Paul B. Carlat, M.D. ("Dr. Carlat") has provided her with a note, dated December 20, 2006,

26  stating that she "is able to function adequately in a work situation."  (See id.; see also Pl.'s

27

28

12

1   App. Ex. 36.)[11]   Additionally, Dr. Bryant, at his December 20, 2006 deposition, testified that

2   plaintiff "certainly can perform [her] job" and that he had no reason to believe that she could

3   not continue to work as she had for the past ten years.  (See Pl.'s App. Ex. 39 (Bryant

4   Dep.) at 69:17-70:7, 71:5-8.)[12]

5                                    **LEGAL STANDARD**

6           Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment as

7   to "all or any part" of a claim "shall be rendered forthwith if the pleadings, depositions,

8   answers to interrogatories, and admissions on file, together with the affidavits, if any, show

9   that there is no genuine issue as to any material fact and that the moving party is entitled to

10  judgment as a matter of law."  See Fed. R. Civ. P. 56(b), (c).  Material facts are those that

11  may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

12  248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a

13  reasonable jury could return a verdict for the nonmoving party."  See id.  The Court may not

14  weigh the evidence.  See id. at 255.  Rather, the nonmoving party's evidence must be

15  believed and "all justifiable inferences must be drawn in [the nonmovant's] favor."  See

16  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989)

17  (en banc) (citing Liberty Lobby, 477 U.S. at 255).

18          The moving party bears the initial responsibility of informing the district court of the

19  basis for its motion and identifying those portions of the pleadings, depositions,

20  interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the

21  absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317,

22  ─────────────────

23          [11] Defendant's hearsay objection to the note from Dr. Carlat is sustained.

24          [12] Defendant's objection to the above-referenced testimony of Dr. Bryant on the
    ground that Dr. Bryant is not plaintiff's treating physician, has made no current diagnosis of
25  her, and therefore is not competent to offer a medical opinion as to whether she is capable
    of working is overruled.  Such objections go to the weight of the evidence, rather than its
26  admissibility; Dr. Bryant testified that although his opinion was "not based on a current
    diagnosis of plaintiff's medical condition," it was based "on the experience that we have had
27  in recent years."  (See id. at 70:3-7, 70:19-23.)  Plaintiff testified at her deposition that
    although Dr. Bryant is not her "primary doctor," she has seen him three or four times a year
28  since 1995.  (See Pl.'s App. Ex. 37 at 98:1-21.)  Defendant cites no evidence suggesting
    plaintiff had significantly deteriorated during 2006.

                                            13

1    323 (1986).  Where the nonmoving party will bear the burden of proof at trial, the moving

2    party's burden is discharged when it shows the court there is an absence of evidence to

3    support the nonmoving party's case.  See id. at 325.

4          A party opposing a properly supported motion for summary judgment "may not rest

5    upon the mere allegations or denials of [that] party's pleading, but . . .  must set forth

6    specific facts showing that there is a genuine issue for trial."  See Fed. R. Civ. P. 56(e); see

7    also Liberty Lobby, 477 U.S. at 250.  The opposing party need not show the issue will be

8    resolved conclusively in its favor.  See Liberty Lobby, 477 U.S. at 248-49.  All that is

9    necessary is submission of sufficient evidence to create a material factual dispute, thereby

10   requiring a jury or judge to resolve the parties' differing versions at trial.  See id.

11         The Ninth Circuit repeatedly has held that the district court is not required to comb

12   through the record sua sponte in search of evidence that would preclude summary

13   judgment.  See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not our task, or

14   that of the district court to scour the record in search of a genuine issue of triable fact.  We

15   rely on the nonmoving party to identify with reasonable particularity the evidence that

16   precludes summary judgment."); see also Carmen v. San Francisco Unified School District,

17   237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for

18   evidence establishing a genuine issue of fact, where the evidence is not set forth in the

19   opposing papers with adequate references so that it could conveniently be found.")

20                                            **DISCUSSION**

21         Plaintiff asserts causes of action alleging employment discrimination, retaliation, and

22   harassment on the basis of sex, age, and disability, in violation, respectively, of Title VII of

23   the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Americans

24   with Disabilities Act.  Defendant now moves for summary judgment with respect to all

25   causes of action.

26      **A.  Sex and Age Discrimination Claims**

27         Plaintiff's sex and age discrimination claims are based on the contention that she

28

14

"was forced to work outside her classification and in a lower work status,[13] under Mr. Katz, whose credentials were inferior to those of Plaintiff," (see Opp. at 24:25-25:1), as well as Dean Zingale's decision to reassign the positions of plaintiff and an assertedly younger male, Thai, with the result that plaintiff was given Thai's job in the Kinesiology department and Thai was given plaintiff's job in the CDSH, (see Supp. Opp. at 5:8-10).

To state a prima facie case of sex discrimination, plaintiff must show "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." See Bergene v. Salt River Project Agricultural Improvement and Power District, 272 F.3d 1136, 1140 (9th Cir. 2001).  To state a prima facie case of age discrimination, plaintiff must show she "(1) was a member of the protected class [age 40-70]; (2) was performing [her] job in a satisfactory manner; (3) was discharged [or otherwise subject to an adverse employment action]; and (4) was replaced by a substantially younger employee with equal or inferior qualifications," or that similarly situated persons outside her protected class were treated more favorably. See Rose v. Wells Fargo & Co., 902 F.2d 1417, 1421 (9th Cir. 1990).  Alternatively, plaintiff may submit "direct evidence of discriminatory intent."  See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998).

If plaintiff satisfies her initial burden, the burden then shifts to defendant to produce evidence of "a legitimate, nondiscriminatory reason" for the adverse employment action.  See Bergene, 272 F.3d at 1140.  If the employer does so, the plaintiff must "show that the articulated reason is pretextual, either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  See Chuang v. University of California Davis Board of Trustees, 225 F.3d 1115, 1124 (9th Cir. 2000).

   **1. Katz Assignment**

---

[13] Plaintiff's expert, Dr. Barrett, concedes that plaintiff's "title remained the same for each job position at SFSU."  (See Barrett Decl. at 11.)

1     Assuming, <u>arguendo</u>, plaintiff has established a prima facie case of sex and age

2 discrimination as a result of her assignment to work under Katz, defendant has articulated

3 legitimate, nondiscriminatory reasons for that assignment.  In particular, Dean Taylor

4 attests that Katz had relevant experience that plaintiff lacked, specifically, a master's

5 degree in counseling with a specialization in school counseling and experience as an

6 academic counselor.  (<u>See</u> Taylor Decl. ¶ 9.)  Additionally, Dean Taylor attests that he felt

7 the job would be an appropriate assignment for plaintiff because "she had expressed an

8 interest in assessment work."  (<u>See</u> <u>id</u>. ¶ 8.)  Plaintiff has submitted no evidence suggesting

9 that the proffered reason for her assignment to work under Katz was a pretext for sex or

10 age discrimination.

11     Accordingly, the Court will grant defendant's motion for summary judgment with

12 respect to plaintiff's claim that she was discriminated against because of her sex and age

13 by being assigned to work under Katz.

14     **2.  Kinesiology Assignment**

15     Assuming, <u>arguendo</u>, plaintiff has established a prima facie case of sex and age

16 discrimination as a result of Dean Zingale's decision to reassign plaintiff and Thai to each

17 other's positions in June 2003, defendant has articulated a legitimate, nondiscriminatory

18 reason for that assignment.  In particular, Dean Taylor attests that the Department of

19 Kinesiology had a new chairman, Dr. Spina, who was new to the university, and Dean

20 Taylor and Dean Zingale thought Dr. Spina "would benefit from having an Administrative

21 Office Coordinator of Plaintiff's experience who was familiar with the complexities of the

22 department."  (<u>See</u> Taylor Decl. ¶ 5.)  Additionally, Dean Zingale's memorandum

23 announcing the reassignment states that plaintiff, "as a veteran AOC with experience in a

24 complex department, has the potential to be a key component in [Dr. Spina's] success,

25 particularly as it relates to dealing with specialized facilities."  (<u>See</u> Def.'s MSJ Ex. X at 1.)

26     In response, plaintiff argues that her becoming a "key component" in Dr. Spina's

27 success "of course, never happened . . . [and] was never intended to happen."  (<u>See</u> Supp.

28 Opp. at 5:13.)  Plaintiff submits no evidence, however, suggesting that the proffered reason

1    for her transfer was a pretext for sex or age discrimination.

2          Accordingly, the Court will grant defendant's motion for summary judgment with

3    respect to plaintiff's claim that she was discriminated against because of her sex and age[14]

4    by being assigned to work in the Department of Kinesiology.

5          **B.  Disability Discrimination Claims**

6          Under the ADA, "[n]o covered entity shall discriminate against a qualified individual

7    with a disability because of the disability of such individual in regard to . . . the hiring,

8    advancement or discharge of employees, employee compensation, job training, and other

9    terms, conditions, and privileges of employment."  See 42 U.S.C. § 12112(a).  To state a

10   prima facie case of discrimination in violation of the ADA, plaintiff must show (1) she is a

11   disabled person within the meaning of the ADA, (2) she is a qualified individual, which

12   requires that she be able to perform the essential functions of her job, with reasonable

13   accommodation if necessary; and (3) her employer either failed to reasonably

14   accommodate her disability or subjected her to an adverse employment action because of

15   her disability.  See Allen v. Pacific Bell, 348 F.3d 1113, 1114 (9th Cir. 2003); Nunes v. Wal-

16   Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999).

17         Here, there is no contention in defendant's memoranda that plaintiff does not suffer

18   from schizophrenia, that her condition is not disabling, or that she could not perform the

19   essential functions of her various positions.

20         **1.  Reasonable Accommodation**

21         With respect to reasonable accommodation, it is undisputed that defendant provided

22   plaintiff with the requested partition around her desk.  There is a triable issue, however, as

23   to whether Dr. Spina discriminated against plaintiff by refusing to permit her to work the

24   modified schedule she requested as an accommodation for her disability.  As noted,

25   plaintiff requested that she be permitted to work from 7:00 a.m. to 4:45 p.m., Monday

26   through Thursday, and from 7:15 a.m. to 12:00 p.m. on Fridays; plaintiff attests that

27

28         [14] Additionally, the Court notes that plaintiff has cited no evidence of Thai's age.

1  although Dr. Spina eventually agreed to a modified work schedule, he "did not give [her] the

2  Friday afternoons [she] needed off for appointments with [her] psychiatrists[.]" (See Keller-

3  McIntyre Decl. at 5.)  As noted, plaintiff testified at her deposition that although she did not

4  tell Dr. Spina that her requested modified work schedule "was necessary because of a

5  psychiatric disability," she made it clear to him that she was requesting the schedule

6  modification as "a disability accommodation."  (See Pl.'s App. Ex. 37 at 186:6-187:1.)

7         Accordingly, defendant's motion for summary judgment with respect to plaintiff's

8  disability discrimination claim will be denied to the extent such claim is based on a failure to

9  accommodate.

10                    **2.  Adverse Employment Action**

11               **a.  Transfers To Positions with Fewer Responsibilities**

12         Plaintiff contends she was subjected to adverse employment actions because she

13  repeatedly was transferred, beginning with her June 2003 transfer to the Department of

14  Kinesiology, to positions with fewer duties and responsibilities than her prior position,

15  based, in each instance, on her disability.  As noted, plaintiff relies on the expert opinion of

16  Dr. Barrett.[15]  Dr. Barrett used the Yale University Clerical and Technical Position

17  Classification Program Questionnaire to conduct an analysis of plaintiff's job duties and

18  responsibilities in her various positions at SFSU; based thereon, Dr. Barrett opines that

19  plaintiff's position at the Department of Kinesiology had fewer job duties and responsibilities

20  than her prior position at CFSD, that her position at the CHHS had fewer job duties and

21  responsibilities than her prior position at the Department of Kinesiology, and that her

22  position at the SRC had fewer job duties and responsibilities than her prior position at the

23  CHHS.  (See Supp. Opp. Ex. 41 at 11-26.)[16]

24  _____

25         [15] As Dr. Barrett's report is sworn, (see Supp. Opp. Ex. 41 at 44), defendant's
       objection to the report as hearsay is overruled.

26         [16] As noted, plaintiff's expert, Dr. Barrett, concedes that plaintiff's "title remained the
27  same for each job position at SFSU."  (See Barrett Decl. at 11.)  Such circumstances do
       not necessarily preclude a finding of an adverse employment action, however.  See, e.g.,
28  Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2416-17 (2006)
       (rejecting contention that no adverse employment action exists where "former and current

Although, as noted, defendants have articulated non-discriminatory reasons for such transfers, plaintiff has submitted sufficient evidence to raise a triable issue as to pretext, i.e., whether plaintiff's disability, and her request for accommodation thereof, were, in whole or in part, the motivation for such transfers.[17]  In particular, plaintiff's transfer to the Department of Kinesiology occurred shortly after plaintiff requested that a partition be erected around her desk; although the partition was erected, plaintiff testified at her deposition that her supervisor, Dr. Rabolt, "opposed the screen."  (See Pl.'s App. Ex. 37 at 122:1-11.)  Additionally, plaintiff attests that Dr. Spina, plaintiff's supervisor at the Department of Kinesiology, opposed her requests for a change in work schedule to accommodate her disability, refused to give her the Friday afternoons off that she needed for appointments with her psychiatrists, and eventually requested that she be reassigned.  (See Keller-McIntyre Decl. at 5-6.)  With respect to her transfer from her position at the CHHS under Dziadur, to her position at the SRC under Katz, plaintiff attests that Dean Taylor and Dziadur "opposed [her] accommodation work schedule," even though "Gene Chelberg, Disability Director supported it."  (See id. at 6.)  Plaintiff further submits evidence that within days after she filed a charge with the EEOC, Dean Taylor berated her, called her a paranoid schizophrenic, and reduced her job duties.  (See Keller-McIntyre Decl. at 8; Keller-McIntyre Supp. Decl. ¶ 2.)

Accordingly, defendant's motion for summary judgment with respect to plaintiff's disability discrimination claim will be denied to the extent such claim is based on the above-

---

job duties fall within the same job description"); Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000) (noting "transfer to another job of the same pay and status may constitute an adverse employment action").

[17] "[T]he ADA does not require that a discriminatory impetus have been the only motive for an adverse employment action."  Dark v. Curry County, 451 F.3d 1078, 1084-85 (9th Cir. 2006) (emphasis in original).  "Rather, the ADA outlaws adverse employment actions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation – a motivating factor standard."  Id. (internal quotation and citation omitted; emphases in original).

1    referenced assertedly adverse employment actions.[18]

2                    **b.  Denial of Plaintiff's Request to Administer MBTI**

3            Plaintiff additionally contends she was subject to disability discrimination because

4    defendant refused to permit her to administer the MBTI to students, even though she

5    obtained the requisite qualification to do so.  As discussed above, plaintiff has submitted

6    evidence that she completed the requisite coursework to administer the MBTI, but that she

7    nonetheless was told by Dean Taylor and Katz that she needed a degree in counseling.

8    (See Keller-McIntyre Decl. at 9.)  Katz further attests, however, that he denied plaintiff's

9    request to administer the MBTI because "career counseling and similar assessment duties"

10   were his areas of responsibility and were not part of plaintiff's job.  (See Katz Decl. ¶¶ 3-4.)

11   Plaintiff submits no evidence suggesting Katz's proffered reason is a pretext for disability

12   discrimination.

13           Accordingly, defendant's motion for summary judgment with respect to the above-

14   referenced claim for disability discrimination will be granted.

15       **C.  Retaliation Claims**

16           Plaintiff alleges she was retaliated against, in violation of Title VII, the ADEA, and the

17   ADA, because she (1) initiated a grievance with respect to assertedly libelous commentary

18   contained in the spring 2003 report concerning Dr. Rabolt's performance as chairperson of

19   the CFSD, and (2) filed an EEOC complaint in the fall of 2005 based on the changes in her

20   job duties.

21           To demonstrate a prima facie case of retaliation, plaintiff must "put forth evidence

22   sufficient to show that (1) she engaged in a protected activity, (2) she suffered an adverse

23   employment action, and (3) there was a causal link between her activity and the

24   employment decision."  See, e.g., Raad v. Fairbanks North Star Borough School District,

25

26           [18] Although, as noted, plaintiff further attests that, in December 2006, she was
27   placed on administrative leave despite her having submitted doctors' notes stating she was
     able to perform her work, (see id. at 10), the Court has not considered such placement as
28   the basis of plaintiff's claims, as plaintiff has not sought leave to amend her complaint to
     include such allegation.

                                              20

323 F.3d 1185, 1196-97 (9th Cir. 2003); O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 763 (9th Cir. 1996).  A "protected activity" consists of "oppos[ing] any practice made an unlawful employment practice" by any of the anti-discrimination statutes, or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing" with respect to such practice.  See Raad, 323 F.3d at 1197; see also 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a).

Plaintiff's complaints about the asserted libel do not constitute a protected activity, because libel is not an "unlawful employment practice" under Title VII, the ADEA, or the ADA.  See Raad, 323 F.3d at 1197; 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a).  Plaintiff's filing of an EEOC complaint, however, does constitute protected activity, and plaintiff has submitted sufficient evidence to raise a triable issue as to whether she was transferred and her job duties reduced as a result thereof.  In that regard, according to plaintiff, Dean Taylor called her into his office the day after she filed her EEOC complaint, berated her for an hour, and called her a "paranoid schizophrenic," (see Keller-McIntyre Decl. at 8); two days after plaintiff filed her EEOC complaint, Katz requested permission from Dean Taylor to reduce plaintiff's job duties, (see Katz Decl. ¶ 12); and seven days after plaintiff filed her EEOC complaint, Dean Taylor approved that request, (see Keller-McIntyre Decl. at 8; Pl.'s App. Ex. 31).  "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision."  See Raad, 323 F.3d at 1197.

Accordingly, defendant's motion for summary judgment with respect to plaintiff's retaliation claim will be denied.

**D.  Harassment Claims**

**1.  Sex and Age Harassment**

Although defendant moves for summary judgment with respect to any claims based on an allegation that sex-based and/or age-based harassment constituted a hostile work environment, no such claims are alleged in plaintiff's complaint, not does she assert them

1    in her opposition.  Nonetheless, to the extent plaintiff may be asserting such claims, she

2    has failed to raise a triable issue of fact with respect thereto.  The Ninth Circuit has held

3    that the elements of a hostile work environment claim are: (1) the plaintiff was subjected to

4    verbal or physical conduct of a sexual or age-related nature; (2) the conduct was

5    unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions

6    of the plaintiff's employment and create an abusive work environment.  See, e.g., Vasquez

7    v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2004) (citing Gregory v. Widnall, 153

8    F.3d 1071, 1074 (9th Cir. 1998)); Sischo-Nownejad v. Merced Community College District,

9    934 F.2d 1104, 1109 (9th Cir. 1991) overruled on other grounds, Dominguez-Curry v.

10   Nevada Transportation Dept., 424 F.3d 1027, 1041 (9th Cir. 2005).  The environment must

11   be "both objectively and subjectively offensive, one that a reasonable person would find

12   hostile or abusive, and one that the victim in fact did perceive to be so."  See Farragher v.

13   City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Systems, Inc., 510

14   U.S. 17, 21 (1993)).  The plaintiff must show that the harassment occurred because of her

15   sex and/or age.  See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).

16

17        Here, there is no evidence of any verbal or physical conduct related to plaintiff's sex

18   and/or age.  Accordingly, the Court will grant defendant's motion for summary judgment

19   with respect to any claim plaintiff may be asserting based on sex-based and/or age-based

20   harassment.

21                    **2. Disability Harassment**

22        Although the Ninth Circuit has never determined whether a claim may be asserted

23   under the ADA predicated on an alleged hostile work environment created by disability

24   harassment, see Brown v. City of Tucson, 336 F.3d 1181, 1190 (9th Cir. 2003) (declining to

25   decide issue), other circuits have held such a claim is cognizable, see, e.g., Flowers v.

26   Southern Regional Physician Services, Inc., 247 F.3d 229, 232 (5th Cir. 2001).  "[T]o

27   succeed on a claim of disability-based harassment, the plaintiff must prove: (1) that she

28   belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3)

1   that the harassment complained of was based on her disability or disabilities; (4) that the

2   harassment complained of affected a term, condition, or privilege of employment; and (5)

3   that the employer knew or should have known of the harassment and failed to take prompt,

4   remedial action." See id. at 235-36.  The harassment "must be sufficiently pervasive or

5   severe to alter the conditions of employment and create an abusive working environment."

6   See id. at 236 (internal quotation and citation omitted).

7        Here, it is undisputed that plaintiff suffers from a disability, specifically,

8   schizophrenia, and, as discussed above, plaintiff has submitted evidence that her

9   supervisors expressed opposition to her requests for accommodation for her disability.  For

10  the reasons set forth below, however, plaintiff has failed to raise a triable issue of fact as to

11  whether any such statements were "sufficiently pervasive or severe to . . . create an

12  abusive working environment."  See id.

13       Courts are "to determine whether an environment is sufficiently hostile or abusive by

14  looking at all the circumstances, including the frequency of the discriminatory conduct, its

15  severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

16  and whether it unreasonably interferes with an employee's work performance."  See

17  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).  Here, the behavior on which

18  plaintiff primarily relies consists of employment decisions with which she disagreed, not

19  physical or verbal conduct of a harassing nature.  Moreover, there is no evidence that the

20  assertedly harassing conduct occurred frequently.  Plaintiff submits evidence that although

21  Dr. Rabolt initially opposed the partition plaintiff requested, the partition nonetheless was

22  erected. (See Pl.'s App. Ex. 37 at 122:1-11; Chelberg Decl. ¶ 5.)  Further, there is no

23  admissible evidence that Dr. Rabolt ever made any derogatory comments relating to

24  plaintiff's disability.[19]  With respect to Dr. Spina, plaintiff submits evidence that plaintiff

25  requested a reduced work schedule as an accommodation for her disability, that Dr. Spina

26

27  _____

28       [19] Indeed, even if the Court were to overrule defendant's objection to plaintiff's
    statement that Dr. Rabolt "mocked" the partition, there is no evidence that such words or
    other behavior, whatever they might be, occurred on more than one occasion.

23

1  strongly opposed that request, and that plaintiff thereafter "dropped" her request. (See

2  Keller-McIntyre Decl. at 5.)  There is no evidence Dr. Spina, either at that time or at any

3  other time, made any derogatory comments relating to plaintiff's disability.  With respect to

4  Dziadur, plaintiff submits evidence that he "opposed [her] accommodation work schedule,"

5  (see Keller-McIntyre Decl. at 6), but submits no evidence of any derogatory comments by

6  Dziadur relating to plaintiff's disability.  With respect to Katz, plaintiff submits no evidence of

7  any comments about plaintiff's disability.  With respect to Dean Taylor, plaintiff submits

8  evidence that Dean Taylor "opposed [her] accommodation work schedule" during her

9  employment with Dziadur, and that approximately one year later, he called plaintiff a

10  "paranoid schizophrenic" during a meeting, (see Keller-McIntyre Decl. at 6, 8); there is no

11  evidence that Dean Taylor ever made any other arguably derogatory comments about her

12  disability.  "[I]solated incidents (unless extremely serious) will not amount to discriminatory

13  changes in the 'terms and conditions of employment'" sufficient to support a hostile work

14  environment claim.  See Faragher, 524 U.S. at 788; see also Little v. Windermere

15  Relocation, Inc., 301 F.3d 958, 967-68 (9th Cir. 2002) (holding client's rape of employee

16  sufficiently "serious" to support hostile work environment claim).

17       Accordingly, the Court will grant defendant's motion for summary judgment with

18  respect to plaintiff's claim of disability-based harassment in violation of the ADA.

19                                     **CONCLUSION**

20       For the reasons set forth above, defendant's motion for summary judgment is

21  hereby GRANTED in part and DENIED in part as follows:

22       1.  With respect to plaintiff's sex and age discrimination claims, and claim of

23  retaliation for filing a grievance about libel, the motion is GRANTED.

24       2.  With respect to plaintiff's claim of retaliation for filing an EEOC charge, the motion

25  is DENIED.

26       3.  With respect to plaintiff's disability discrimination claim, the motion is GRANTED

27  to the extent such claim is based on the denial of plaintiff's request to administer the MBTI,

28  and DENIED in all other respects.

24

1    4.  With respect to plaintiff's claim of harassment on the basis of sex, age, and/or

2 disability, the motion is GRANTED.

3    This order terminates Docket No. 141.

4    **IT IS SO ORDERED.**

5 Dated: March 12, 2007

   _____
   MAXINE M. CHESNEY
   United States District Judge

25